# UNITED STATES DISTRICT COURT
for the
Eastern District of Louisiana

**SEALED**

United States of America
v.
LIZA FLANERY FIERRO

Case No. 19-142 MAG

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **January 2016 - October 2018** in the parish of **Plaquemines** in the **Eastern** District of **Louisiana**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | Frauds and swindles |
| 18 U.S.C. § 1343 | Wire fraud |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

_Brett Heil_
*Complainant's signature*

Special Agent Brett Heil, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 09/29/2019

_Dana M. Douglas_
*Judge's signature*

City and state: New Orleans, Louisiana

Honorable Dana M. Douglas, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA      **SEALED**

| UNITED STATES OF AMERICA | * | CRIMINAL NO. 19-142 MAG |
|---|---|---|
| v. | * | SECTION: MAGISTRATE |
| LIZA FLANERY FIERRO | * | |
| | * | |

\* \* \*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Brett Heil, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for an arrest warrant for LIZA FLANERY FIERRO (hereafter FLANERY FIERRO), date of birth (DOB) 03/05/1986, country of citizenship (COC) Mexico.

2. I am a Special Agent with the Federal Bureau of Investigation (hereinafter, the "FBI"). I am assigned to the Cyber Squad located in the New Orleans Field Division. I have been a Special Agent since September 2017. As a Special Agent with the FBI, I am tasked with investigating various types of federal fraud and cybercrime, including but not limited to computer intrusions, identity theft, internet crimes, and other frauds and swindles.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts in this affidavit come from, among other things, my personal observations, my training and experience, and information obtained from other entities and witnesses throughout the course of the investigation.

4. The facts set forth in this affidavit establish possible violations of the following statutes: 18 U.S.C. § 1341 (Frauds and swindles); 18 U.S.C. § 1343 (Wire Fraud)

## JURISDICTION

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

6. In summary, the United States is investigating Planet Travel, Newport International Investments (hereafter "Newport International"), and associated businesses and subjects based on (a) the scheme described below and (b) the subsequent transfer of proceeds suspected to be fraudulent to multiple accounts at the behest of employees of the above companies. Furthermore, a thorough review of investigative evidence obtained through email search warrants, customer subpoenas, and victim interviews revealed that LIZA FLANERY FIERRO, aka LIE, was a senior-level employee directly engaged in the commission of the captioned timeshare purchase fraud scheme which victimized over 100 individuals and led to a minimum financial loss of ~$10,500,000.

7. As set forth in greater detail below, beginning at least as early as January 2016, FLANERY FIERRO and her co-conspirators (the "defendants") defrauded over 100 individuals out of more than $10 million by falsely representing that they would sell the victims' timeshare units in return for purportedly-reimbursable closing fees when, in reality, they had no intention of selling the victims' timeshare units or reimbursing the victims for the fees they paid. In furtherance of their scheme, the defendants: (1) created and controlled companies located in Mexico that defendants falsely told victims were located in the United States; (2) through gross misrepresentation, convinced the victims to contract with them to advertise/sell their timeshare properties; (3) directed victims to wire funds to pay for fake, purportedly-reimbursable escrow fees, taxes, and other closing-related expenses ahead of the purported timeshare sale; (4) never sold the timeshare properties; (5) never repaid the purported fees, taxes, and other expenses; and (6) used victim funds for their own benefit. In doing so, the defendants knowingly caused victims' funds to be transferred by interstate and international wires.

**Case Background – Initial Victims**

8. In June 2018, FBI New Orleans was notified of a potential fraud scheme that victimized a local married couple (hereafter "Victim 1"). An initial investigation into Victim 1's complaint revealed that they were defrauded out of approximately $540,000 USD as part of a real estate scam associated with the purchase of their timeshare in Mexico. The primary subjects, operating under the business names Planet Travel and Newport International Investments, contacted Victim 1 in or around June 2017 to inquire about purchasing a portion of their timeshare in Mexico. Victim 1 agreed to the purchase price of $48,750, which was to be held in escrow by Newport International Investments until a background check was conducted on the property and a standard finders-fee was paid by Victim 1. However, after signing a contract and paying the initial

3

fee, the subjects proceeded to require new fees and taxes associated with the purchase, claiming that the purchase funds owed to Victim 1 could not be released until the new payments were made. This pattern continued for nearly a year, until Victim 1 had made over $540,000 in payments without being reimbursed for the fees or receiving the agreed upon purchase price of the timeshare, both of which were contractually promised by Planet Travel and Newport International.

9. In July 2018, FBI New Orleans identified a second couple, located in Oregon, who were defrauded by Planet Travel and Newport International (Victim 2). In September 2017, Victim 2 received a call from a representative of Planet Travel inquiring about selling their timeshare in Mayan Palace, Nueva Vallarta, Mexico. The subsequent fact pattern was identical to the one established by Victim 1. Victim 2 signed a formal contract with Planet Travel and Newport International to sell their timeshare, paid an initial upfront closing fee, and was subsequently told by associates of Planet Travel and Newport International that additional payments were required in order to receive the funds promised to them for selling their timeshare. In this instance, Victim 2 made fourteen payments totaling $291,634 to Mexican bank accounts provided by associates of Planet Travel and Newport International. Just as with Victim 1, Victim 2 never received the payment for the purchase of their timeshare unit, nor were they repaid for any of the taxes or fees paid at the behest of Planet Travel and/or Newport International.

10. Subsequent investigation conducted by FBI New Orleans revealed numerous additional victims defrauded by Planet Travel and Newport International and, furthermore, that Planet Travel and Newport International were only pieces of a larger criminal fraud organization, operating out of Mexico, that had perpetrated the sophisticated fraud scheme against victims throughout the United States, and abroad, over the last 3-4 years. In each case, an individual that owned a timeshare or resort property in Mexico was contacted by a company that offered to

4

advertise or sell the customer's property for a small fee. The companies were legally registered in the United States, maintained a U.S. address (through virtual office space networks), operated a professional-looking website, and listed legitimate email addresses and U.S. phone numbers. In each case, a legitimate-looking contract was signed between the sellers (i.e. victims) and the subject companies [Affiant Note: The FBI identified multiple, interconnected companies engaged in the fraud scheme that were all operated by the overarching criminal organization]. The initial contract included a single fee to the subject companies in exchange for brokering the sale. In each case, after the contract was signed and the initial fee was paid by the customer, the subject companies would begin to require a series of additional taxes or payments that they claimed were necessary before the purchase funds from the alleged buyer could be released to the seller. Typically, the rationale given to sellers was that a Mexican tax or other government fee needed to be paid, but they were always guaranteed by the companies that these additional payments would be reimbursed. In each case, the representatives of the subject organizations (i.e. Planet Travel, Newport International, etc.) instructed customers to wire their payments to bank accounts in Mexico, and required the sellers to provide a receipt of the successful wire transaction, as well as a copy of their driver's license or passport. In each case, this pattern continued until the customer refused to make any further payments. Over the course of the investigation, the FBI discovered no instances in which the sellers received either reimbursement for their payments or the initial purchase price of their timeshare.

**Subsequent Investigation and Findings**

11.     Based on initial investigative findings, which identified Planet Travel and Newport International as the organizations engaged in the fraudulent timeshare purchase process, your affiant gathered open source information about both companies, to include company websites,

email addresses, phone numbers, business filings, etc. As previously stated, both companies were legally registered in the United States, operated a professional-looking website, maintained a physical U.S. address, and publicly listed legitimate email addresses and U.S. phone numbers.

12. The company's physical addresses were listed in Colorado (Newport International) and Wyoming (Planet Travel), and tied to virtual office space companies that provided business services (mail forwarding, physical addressing, etc.) that enabled the companies to run business activities through the address while operating remotely. Follow-up, both in-person and over the phone, with the virtual office space providers indicated that neither company had employees working at the physical addresses of the office spaces. Furthermore, email search warrant records, further detailed below, indicated that the operatives of Planet Travel and Newport International were located in Mexico.

13. In response to a subpoena, your affiant obtained customer records from Regus (the virtual office space provider for Newport International) and identified Linda Ward (WARD), email address lindaruthgrahamward@gmail.com as the entity through which Newport International was registered.

14. A subsequent search warrant for the account contents of lindaruthgrahamward@gmail.com identified a significant amount of communication facilitating the operational activities of the timeshare fraud scheme. In addition to officially registering Newport International, the account was used to facilitate physical mail delivery to and from multiple customers and engage with other individuals within the criminal organization, to include conversations with the salesmen who were in direct contact with the victims being defrauded. Furthermore, lindaruthgrahamward@gmail.com engaged in communication with multiple individuals that were clearly higher-level functionaries in the organization, such as Robin

Birmingham, (birminghamrobin@gmail.com), Julie Batista (juliebatista6@gmail.com), and Gina Mora (gina.mora629@gmail.com) [Affiant Note: As detailed below, these names were pseudonyms used by the defendants to protect their identities]. For instance, on multiple occasions juliebatista6@gmail.com (BATISTA) and gina.mora629@gmail.com (MORA) forwarded personal contact information and documents associated with a timeshare purchase agreement (contract addendums, wire instructions, etc.) to WARD, either directly or through birminghamrobin@gmail.com (BIRMINGHAM). Each time, WARD subsequently had Regus (Newport International's virtual office space provider) print and mail the information to a potential "seller." On multiple occasions, the seller was an identified victim that had submitted complaints about financial loss related to Planet Travel and/or Newport International.

15. A subsequent series of search warrants on multiple email accounts tied to the scheme, including those of BIRMINGHAM, BATISTA, and MORA, corroborated their involvement in the scheme at the highest levels, while also revealing their true identities [Affiant Note: As further detailed below, through internal payroll spreadsheets and other communications sent over email, your affiant identified that Julie Batista's true name is CLAUDIA ELENA ANTILLON ZAHUITA, and that Robin Birmingham's true name is MARTIN ALONSO ACEVES CUSTODIO. The email search warrants also revealed the full scope of the organization and its criminal fraud activities, to include general operating procedures, other fraudulent companies operated by the organization, and additional victims.

*General Operating Procedures and Communication Patterns:*

16. Information gleaned from the aforementioned email search warrants revealed the following operating procedures and communication patterns associated with the criminal activity of the organization:

A. Internal email communications amongst organizational employees were conducted almost entirely in Spanish, and employees adhered to operational security (OpSec) principles throughout their communications. First, on multiple occasions employees were encouraged to use Virtual Private Networks (VPNs), which would ensure secure/anonymous online activities. Second, rather than addressing each other by their true names, employees utilized pseudonyms (i.e. Julie Batista, Robing Birmingham, etc.), and three letter coded acronyms they referred to as "claves" (which loosely translates to "Key" or "Code" in Spanish). The true identities of high-level actors, as well as multiple other individuals in the organization, were identified through a series of email communication discoveries, which are addressed in detail in paragraphs 20-23.

B. Potential customer leads are initially sent to ACEVES CUSTODIO (aka Robin Birmingham; aka ALA), the chief executive of the operation, who passes them down to senior administrators and supervisors, who ultimately assign the lead(s) to sales agents.

C. The assigned Sales Agent begins cold calling potential customers as the representative of one of multiple companies that were identified as operating under the umbrella organization. The customers are told there is a buyer for their timeshare property and, if they are willing to sell, the Sales Agent and his/her company (i.e. Planet Travel) offer to act as the intermediary to broker the sale. On most occasions, an escrow company (i.e. Newport International) that will handle the financial transfers is also introduced (the escrow companies are operated by the same overarching organization as the sales companies).

D. If the customer agrees to sell their property, the Sales Agent provides a contract for the customer to sign. The contract typically includes a small finder's fee or portion of the sale that the customer must pay as part of the sale. The initial contract does not include any additional taxes or fees.

E. Once the initial contract is signed, they begin to introduce a series of surprise taxes, fees, and other payments that must be made by the seller before the buyer's funds can be released to the customer selling the property. These payments are always required to be made via wire transfer, with the beneficiary accounts located in Mexico.

- Your affiant identified a "Checklist" (see Figure 1 below) sent from ACEVES CUSTODIO to ANTILLON ZAHUITA (aka Julie Batista). The checklist outlined the progressive series of fees that the Sales Agent should attempt to extract from the customer. Each tax, fee, etc. comes with a boiler plate explanation of why the

new payment is required, and at each level customers are promised that they will be reimbursed for the fees and suffer no financial loss.



Figure 1 – Checklist of fraudulent payments sent between organizational subjects over email. The listed fees match the fees representatives of Planet Travel, Newport International, etc. required victims to pay.

F. Each time a new fee is paid by a customer, the wire transaction is documented via emails from the sales agents and/or their supervisors to the administrators (ANTILLON ZAHUITA and BARAJAS RAMIREZ), and then to the Chief Executive (ACEVES CUSTODIO). The documentation email typically contains a copy of the wire transfer receipt and a driver's license (or other government identification card) from the customer.

- Your affiant identified a series of emails, sent monthly to ACEVES CUSTODIO from BARAJAS RAMIREZ, which identified all the customers included in the fraud scheme, and summarized the financial transactions that were the end result of the scheme. The emails were always entitled "Cash Flow" (or some version of Cash Flow) and included an attached spreadsheet. The spreadsheet showed financial transactions the organization had received from individuals between January 2017 and the month in which the spreadsheet was created/shared. Each row in the spreadsheet included the name of the customer, the name of the business entities through which the contract was brokered, the three letter coded acronym of the sales agent/supervisor associated with the sale (which correlated with the organizational

9

chart and payroll spreadsheet highlighted in paragraphs 20-23 below), the financial amount received, and the type of fee that had been applied (which corresponded with the aforementioned "Checklist" of fees ACEVES CUSTODIO provided ANTILLON ZAHUITA).

- A more recent Cash Flow report, sent in October 2018, identified over 100 customers, including initial complainants Victim 1, Victim 2, and multiple other previously identified victims. In total, the spreadsheet indicated that the organization had received over $10,400,000 in wire transfers to approximately a dozen bank accounts in Mexico from January 2017 - October 2018 [Affiant Note: these transactions were also corroborated by wire transaction receipts provided by victims and identified in email correspondence within the organization.]

G. The process repeats until the customer refuses to pay any additional fees, or runs out of money.

**Organizational Structure and True Identities**

17. Internal communications between employees of the criminal organization ultimately revealed a clear hierarchy, and the true identities of the individuals engaged in the fraud operation, to include FLANERY FIERRO:

18. A document identified in ACEVES CUSTODIO's email account included a payroll spreadsheet for the organization. The spreadsheet outlined each employee's bank account number, salary, and "level" within the company. Employees were listed between Level 0 (executive-level employees/salaries) and Level 3. These payroll spreadsheets, which were subsequently seen shared and updated on multiple occasions, also included each employee's true name, corresponding three letter acronym ("clave"), and personal email address, which were corroborated by subsequent email search warrants of the personal email accounts tied to each operative. The spreadsheet identified employee "LIE" as LIZA MELISSA FLANERY FIERRO, as an Executive Level employee with a pay period salary of $248,156.83 Mexican Pesos.

| Comisionistas NIVEL 0 Altos y Constantes | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Clave | Nombre | Apellido | Apellido | Banco | Clabe | Cuenta | email | Comision Bruta |
| ALA | Martin Alonso | Aceves | Custodio | | | | | $ 248,156.83 |
| LIE | Liza Melissa | Flanery | Fierro | | | | | $ 248,156.83 |

*Figure 2 – Payroll spreadsheet identifies full name and code name ("LIE") for Flanery Fierro.*

19. Furthermore, your affiant identified deposit receipts into FLANERY FIERRO's Mexican bank account from at least one payroll account that the FBI has corroborated was tied to the fraud.

20. On December 29, 2018 ACEVES CUSTODIO and FLANERY FIERRO flew from Mexico to Chicago Midway Airport, at which time they were interviewed and searched by Customs and Border Patrol (CBP). FLANERY FIERRO's Apple iPhone and ACEVES CUSTODIO'S Blackberry Phone were obtained in order to perform an electronic media search. During the inspection, numerous messages pertaining to financial transactions, many in substantial amounts, were discovered. CBP also identified a notebook belonging to ACEVES CUSTODIO. A review of ACEVES CUSTODIO's notes revealed names, acronyms, and other information directly tied to the fraud scheme, including a page of handwritten notes that revealed prepared remarks for an event titled "2nd Anniversary." The remarks, quoted below, reference CUSTODIO's wife [FLANERY FIERRO] as an associate responsible for bringing the group together:

> "...those people that have [done] an outstanding job this year: "We have in the admin area Claudia, let's give her a hand. In operations we have Guille, In I.T. Management Arturo...In the coordination of projects consiglieri Cesar Vazquez. And in sales for CAS Christian, Paco, Silem...LTN Maybelline, Mauricio, and Kevin...And LAP Samer and Emiliano. I also want to recognize the effort of the...Monitors: Isabel, Sigrid, and Fabiola...Officials: Mariana, Ana and Linda...And to all the salespeople that make this family a dignified and enjoyable place of work...To our accountants Edy and Ramon, and also the floor auxiliaries: Caro, Mayra, Sandy, Wendy, Yadira, Jaime...and to the person responsible for all of us being together my associate and wife....But above all to the salespeople that

*have made these 9.5 M in sales in the year seem like something simple with outstanding performance...The goal for next year is 12m."*

21. On September 27th, four subjects associated with this investigation were arrested at Miami International Airport. During subsequent interviews, three of the subjects stated that FLANERY FIERRO was associated with the scheme and was aware of the fraud being perpetrated. One of the subjects indicated that FLANERY FIERRO was very involved during the initial creation of the organization/scheme, and had a role in both bringing the employees together and facilitating the actual scheme, but that she subsequently became less involved in the day-to-day operations as time went on.

## CONCLUSION

22. Based on the forgoing, I request that the Court issue the proposed arrest warrant for LIZA FLANERY FIERRO.

Respectfully submitted,

_Brett Heil_
Brett Heil
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before this ___ day of September, 2019.

_____
HONORABLE DANA M. DOUGLAS
UNITED STATES MAGISTRATE JUDGE